John G. Knepper
WY Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

David A. Cortman*
AZ Bar No. 029490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 030469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Plaintiff*

*Admitted *Pro Hac Vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WYOMING RESCUE MISSION, <br><br> *Plaintiff,* <br><br> v. <br><br> EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ET AL., <br><br> *Defendants.* | Civil Case No.: 1:22-cv-00206 <br><br> PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ iv

Introduction ..................................................................................................... 1

Facts ................................................................................................................. 2

A. Wyoming Rescue Mission. .............................................................. 2

    1. The Mission's faith-based employment practices further its purpose and mission. ........................................................... 2

    2. The Mission's Rescued Treasures thrift stores also play an integral role in the Mission's purpose and mission. ......................... 4

B. Federal and State Employment Discrimination Law. ................... 5

    1. Title VII of the Civil Rights Act. ....................................... 5

    2. The Wyoming Fair Employment Practices Act. ................. 6

C. Defendants enforce FEPA and Title VII against the Mission despite religious exemptions. ......................................................... 7

    1. The Department informs the Mission it cannot prefer hiring members of the same faith. ........................................... 7

    2. Defendants investigate the Mission for preferring coreligionists. ................................................................... 7

    3. Defendants cabin FEPA's and Title VII's religious exemptions and find probable cause that the Mission discriminated. ................................................................... 8

Legal Standard ............................................................................................... 10

Argument ....................................................................................................... 10

I. The Mission is likely to succeed on the merits of its claims. ...................... 10

A. Defendants' enforcement of FEPA and Title VII violate the Mission's religious autonomy. ........................................................ 10

    1. The Mission has a constitutional right to prefer coreligionists for all positions. ............................................................. 12

2. The Mission's donation center associate, store section lead, and shelter associate positions are also covered by the ministerial exception. ....................................................... 17

B. Defendants' enforcement of FEPA and Title VII violate the Mission's other First Amendment rights. ............................................. 19

1. Defendants' enforcement of the laws are neither neutral nor generally applicable and thus violate the Free Exercise Clause. ........................................................................................... 19

2. Defendants' enforcement of the laws also violate the Mission's right to expressive association. ........................................ 20

3. FEPA and Title VII fail strict scrutiny as applied to the Mission. ................................................................................................... 22

C. The EEOC's interpretation and application of Title VII violates RFRA. ................................................................................................... 23

II. The other preliminary injunction factors weigh heavily in favor of granting injunctive relief. ........................................................................ 24

Conclusion ..................................................................................................... 25

Certificate of Service ..................................................................................... 27

## Cases

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) .............................................................. 20

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ......................................................... 20, 21, 22, 23

*Bryce v. Episcopal Church in the Diocese of Colorado,*
289 F.3d 648 (10th Cir. 2002) ........................................................ 14, 17

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) .............................................................................. 10

*Christian Legal Society v. Walker,*
453 F.3d 853 (7th Cir. 2006) ................................................................ 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ........................................................................ 19, 20

*City of Boerne v. Flores,*
521 U.S. 507 (1997) .............................................................................. 22

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ....................................................... 12, 13, 15, 16

*Employment Division v. Smith,*
494 U.S. 872 (1990) .............................................................................. 17

*Equal Employment Opportunity Commission v. Mississippi College,*
626 F.2d 477 (5th Cir. 1980) ................................................................ 13

*Equal Employment Opportunity Commission v. Townley Engineering & Manufacturing Co.,*
859 F.2d 610 (9th Cir. 1988) ................................................................ 16

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ......................................................... 19, 20, 22, 23

*Hall v. Baptist Memorial Health Care Corp.,*
215 F.3d 618 (6th Cir. 2000) ................................................................ 13

*Hobby Lobby Stores, Inc. v. Sebelius,*
723 F.3d 1114 (10th Cir. 2013) ............................................... 10, 24, 25

*Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission,*
565 U.S. 171 (2012) ........................................................... 9, 10, 11, 21

*International Ass'n of Machinists v. Street,*
367 U.S. 740 (1961) .............................................................................. 24

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,*
 344 U.S. 94(1952) ................................................................ 2, 11, 12

*Kikumura v. Hurley,*
 242 F.3d 950 (10th Cir. 2001) ........................................... 24

*Killinger v. Samford University,*
 113 F.3d 196 (11th Cir. 1997) ............................................ 14

*Korte v. Sebelius,*
 735 F.3d 654 (7th Cir. 2013) .............................................. 15

*Little v. Wuerl,*
 929 F.2d 944 (3d Cir. 1991) ............................................... 13

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
 138 S. Ct. 1719 (2018) ...................................................... 20

*National Labor Relations Board v. Catholic Bishop of Chicago,*
 440 U.S. 490 (1979) .......................................................... 12

*New York v. Cathedral Academy,*
 434 U.S. 125 (1977) .......................................................... 13

*Our Lady of Guadalupe School v. Morrissey-Berru,*
 140 S. Ct. 2049 (2020) ............................................. 11, 17, 18

*Seattle's Union Gospel Mission v. Woods,*
 142 S. Ct. 1094 (2022) ................................................. 11, 16

*Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich,*
 426 U.S. 696 (1976) ..................................................... 12, 14

*Spencer v. World Vision, Inc.,*
 633 F.3d 723 (9th Cir. 2011) ............................................. 13

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) .......................................................... 24

*Watson v. Jones,*
 80 U.S. 679 (1871) ........................................................... 11

**Statutes**

42 U.S.C. §§

 2000e-2(a)(1) ...................................................................... 5

 2000bb-1 ............................................................................ 23

 2000bb-3(a) ....................................................................... 23

2000e(b) ................................................................................................. 6

2000e(j) ................................................................................................. 6

2000e-1(a) ....................................................................................... 6, 15

2000e-2(a)(2) ......................................................................................... 5

2000e-3(b) ............................................................................................. 5

2000e-5 .................................................................................................. 5

Wyoming Statutes Annotated §§

27-9-102(b) ...................................................................................... 7, 15

27-9-104(a) ............................................................................................ 6

27-9-105(a)(i) ......................................................................................... 6

27-9-106(a) ............................................................................................ 6

27-9-106(m) ........................................................................................... 6

27-9-106(n) ............................................................................................ 6

## Other Authorities

Kenneth Lasson, Free Exercise in the Free State: Maryland's Role in Religious
Liberty and the First Amendment,
31 J. CHURCH & ST., Fall 1989. .......................................................... 11

## Regulations

Wyo. Admin. Code 053.0024.3 § 6 .......................................................... 7

<center>**INTRODUCTION**</center>

Wyoming Rescue Mission is a nonprofit Christian rescue mission that provides free meals, a homeless shelter, addiction recovery programs, life skills classes, job training, biblical counseling, and free clothing and essentials to those who need them. The Mission fulfills its religious purpose by serving the people of Casper through its programs and services and by spreading its Christian beliefs and teachings. Because its overarching goal is to "propagate the Gospel of Jesus Christ," Verified Compl. ("VC"), Ex. 1 at 1, the Mission maintains a community of likeminded believers who desire to share the love of Christ, to spread the Gospel, and to help one another in their faith. So the Mission only hires coreligionists: people who agree with and live out its religious beliefs and practices.

Wyoming's Fair Employment Practices Act ("FEPA") and Title VII of the Civil Rights Act of 1964 contain religious exemptions that allow the Mission to hire only coreligionists for *all* positions. But the Wyoming Department of Workforce Services ("the Department") and the federal EEOC have narrowed those exemptions by determining that they only protect the Mission's employment decisions for positions those agencies deem to be "ministerial," not for all employees. Because of Defendants' misinterpretations, FEPA and Title VII now force the Mission to hire nonbelievers. And the threat is real. Within the last year, Defendants concluded a 16-month long investigation, finding that the Mission likely engaged in unlawful discrimination for declining to hire a self-proclaimed "non-Christian."

Because of Defendants' current enforcement of FEPA and Title VII, the Mission is suffering both ongoing and threatened injuries. The Mission has paused hiring for the same position Defendants have said must be filled with nonbelievers, removed its employment application and religious hiring criteria from its website, and refrained from making faith-based employment decisions for current employees. VC ¶¶ 155–57, 160–63. This chills the Mission's exercise of its First

<center>1</center>

Amendment rights here and now. What's more, the Mission recently made hiring decisions where it screened applicants based on whether they share the Mission's religious beliefs. VC ¶¶ 53, 147, 173. And it plans to fill over 30 more positions in the coming year given current openings and anticipated needs, where it will again advance only those applicants who share and live out the Mission's religious beliefs. VC ¶¶ 148, 149. This opens the Mission up to imminent investigations and enforcement proceedings.

Defendants' enforcement of FEPA and Title VII violates the Mission's First Amendment right to "decide for [itself], free from state interference, matters of [internal] government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952). This right to religious autonomy, and its included coreligionist exemption, prevent Defendants from interfering with the Mission's decisions to hire based on faith. But by analyzing on a position-by-position basis whether a job is "religious enough" to fall within their rewritten exemptions, Defendants unconstitutionally restrict the Mission's religious exercise and expression, and entangle themselves in religious decisions that governments have no business in regulating.

Since Defendants refuse to apply statutory protections, only this Court can vindicate the Mission's constitutional rights.

<u>FACTS</u>

**A. Wyoming Rescue Mission.**

**1. The Mission's faith-based employment practices further its purpose and mission.**

Wyoming Rescue Mission is a nonprofit Christian rescue mission that has served the Casper community since 1978. The Mission's various ministries deliver much needed assistance to the homeless and needy. Decl. of Brad Hopkins ("Hopkins Decl.") at ¶¶ 8–14. For instance, the Mission serves free meals three

times a day to anyone who is hungry. *Id.* at ¶ 13. Its homeless shelter provides both long-term and overnight shelter services for men, women, and children. *Id.* And its Discipleship Recovery Program helps men and women who have struggled with addiction get back to sobriety and transition to independent living. *Id.* The Mission's ministry also includes job-training, biblical counseling, and a clothing voucher program through its Rescued Treasures thrift stores. *Id.* at ¶ 14.

Because the Mission is a *Christian* organization, its religious beliefs guide every aspect of its operations, services, and programs. *Id.* at ¶¶ 5–6. The Mission roots its religious beliefs in the Holy Bible, which it believes "to be the inspired, infallible, Authoritative Word of God." *Id.* at ¶ 7. The Mission furthers its religious mission through evangelism, acts of service, and discipleship. Evangelism because the Mission's overarching goal is to spread the Gospel of Jesus Christ; acts of service because the Mission's religious beliefs teach that it must care for the needy; and discipleship because the Mission's beliefs teach that it must help its employees and guests grow in their Christian faith. *Id.* at ¶¶ 11, 13. The Mission thus fulfills its religious purpose both through serving the community and through the teaching and spreading of Christian beliefs and values. *Id.* at ¶ 12.

The Mission employs more than 60 employees. VC ¶ 38. To achieve its religious mission and purpose, the Mission requires all employees to agree with and live out its religious beliefs and practices. Hopkins Decl. at ¶¶ 15–16. Maintaining an internal community of likeminded believers ensures the Mission spreads the Gospel through all its ministries. *Id.* at ¶ 17. It also immerses employees in a Christian environment where they can grow together in their faith, engage in corporate fellowship and worship, and "stir up one another to love and good works." *Id.* (quoting Hebrews 10:24). Employing individuals who do not share the same faith would discredit and destroy the Mission's overtly religious purpose, and undermine its Gospel message.

The Mission is upfront about its religious employment requirements. Before having to take it down, the Mission's "Career Opportunities" webpage explained that "[e]mployees are expected to commit to the precepts in our Statement of Faith, and to help the Mission fulfill its mission statement, vision statement and ends statement." *Id.* at ¶ 18; VC ¶¶ 46, 157. The Mission's employment application further explains that "every position [is] one of ministry" and all employees "must be willing to lead and/or participate in Bible study, prayer, devotions and sharing the Gospel." VC, Ex. 3 at 1. And all applicants must certify that they "believe and agree" with the Mission's Statement of Faith and that they "agree to conduct [themselves] in compliance" with the Mission's Ministry Principles, which expects employees to live a Christian life consistent with Bible and share the Christian faith with those the Mission serves. VC, Ex. 3 at 3–4.

To ensure it hires coreligionists, the Mission conducts telephone prescreen interviews where applicants are again told the Mission is a Christian organization and that all employees must agree with its religious beliefs and show Christian principles in their life and work. Hopkins Decl. at ¶ 20. During the prescreen process, many applicants express disagreement with the Mission's religious beliefs and conduct requirements. *Id.* at ¶ 21. The Mission screens out those who disagree so that only coreligionists advance in the interviewing process. *Id.*

> **2.** **The Mission's Rescued Treasures thrift stores also play an integral role in the Mission's purpose and mission.**

The Mission has two thrift stores—named Rescued Treasures—that further the same religious purpose, mission, and vision. The Mission holds the same religious hiring standards for employees who work at Rescued Treasures because they too are expected to spread the Gospel, model Christ, and disciple one another. *Id.* at ¶¶ 23–26.

The thrift stores not only help fund the Mission's ministries, but they also play a vital role in the Mission's Discipleship Recovery Program. *Id.* at ¶¶ 24–25. This program is a one-year, Bible-based recovery program that helps men and women struggling with addiction transition back to health and independence. *Id.* In part of the program, discipleship guests participate in the "Servanthood Training Program" at Rescued Treasures, where they work alongside Mission employees. *Id.* Servanthood training gives discipleship guests valuable work experience, while immersing them in an environment of Christian believers who will teach and lead them spiritually and vocationally. *Id.* Having Christian employees at Rescued Treasures is critical because they teach discipleship guests how to live a Christian life, how to spread the Gospel, and how to incorporate faith in all that they do. *Id.*

## B. Federal and State Employment Discrimination Law.

### 1. Title VII of the Civil Rights Act.

Title VII prohibits religious discrimination in employment. It does so by forbidding an employer from (a) discriminating in the "terms, conditions, or privileges of employment"; (b) "limiting, segregating, or classifying . . . applicants"; and (c) publishing a notice or advertisement "indicating any preference, limitation, specification, or discrimination" because of, or based on, religion. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(a)(2), 2000e-3(b).

Defendants EEOC and Burrows enforce Title VII, *id.* § 2000e-5, and the Department also enforces it under a workshare agreement with the EEOC, *see* VC, Ex. 5 at 6. Any person "claiming to be aggrieved" or any commissioner can file a complaint with the EEOC, and the EEOC *must* investigate those complaints. 42 U.S.C. § 2000e-5(b). Following an investigation, an employer can face all the enforcement actions under 42 U.S.C. § 2000e-5, including suits brought by the

EEOC, private lawsuits, injunctions forcing affirmative action, costs, attorney's fees, and compensatory and punitive damages.

But Title VII does not apply to all employers. It does not apply to those with fewer than 15 employees, *id.* § 2000e(b), or to employers with respect to their employees outside the United States, *id.* § 2000e-1(a). And Title VII exempts "religious corporation[s] . . . with respect to the employment of individuals of a particular religion to perform work connected with . . . its activities." *Id.* § 2000e-1(a) (Title VII's religious exemption). And it defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). But as explained below, *infra* § C.2., Defendants refuse to apply Title VII's religious exemption to the Mission.

## 2.    The Wyoming Fair Employment Practices Act.

Like Title VII, Wyoming's FEPA prevents employment discrimination because of a person's "creed." Wyo. Stat. Ann. § 27-9-105(a)(i). Also like Title VII, "[a]ny person" who believes he or she was discriminated against in violation of FEPA can file a complaint with the Department. *Id.* § 27-9-106(a).

The Department has various mechanisms to enforce FEPA. It can investigate, issue determinations, urge mediation, serve subpoenas for witnesses and records, enforce subpoenas in court, and enact regulations. *Id.* § 27-9-104(a). Failure to comply with the Department in an investigation can be punishable by contempt of court, *id.*, and the Department can enforce a hearing officer's decision in state court, *id.* § 27-9-106(m). Such a decision can require an employer to: (a) cease and desist from a discriminatory or unfair practice; (b) take remedial action such as hiring, retaining, reinstating, or upgrading of employees; (c) post notices and make reports to ensure compliance with FEPA; (d) pay backpay and front pay; and (e) make any other relief deemed necessary. *Id.* § 27-9-106(n). In

addition, a complainant can sue an employer in state court by seeking judicial review of a hearing officer's decision. Wyo. Admin. Code 053.0024.3 § 6.

Similar to Title VII, FEPA exempts religious organizations and associations by excluding them from the definition of "employer." Wyo. Stat. Ann. § 27-9-102(b) (FEPA's religious exemption). Yet as explained below, *infra* §§ C.1–2., the Department refuses to apply FEPA's religious exemption to the Mission.

## C. Defendants enforce FEPA and Title VII against the Mission despite religious exemptions.

### 1. The Department informs the Mission it cannot prefer hiring members of the same faith.

Before 2020, the Mission posted its job openings on the Department's job postings webpage. Decl. of Brenda Thomson ("Thomson Decl.") at ¶¶ 4–5. These job postings set forth the Mission's Statement of Faith and explained that the Mission expected employees to agree with its religious beliefs. *Id.* In late 2019, however, the Department told the Mission it was illegal for the ministry to hire or fire based on religious belief and that it could not include religious employment criteria in its job postings. *Id.* at ¶¶ 7–13. Rather than abandon its faith-based hiring practices, the Mission was forced to stop posting on the Department's website and has since lost out on an important pool of potential job applicants. *Id.* at ¶¶ 14, 16.

### 2. Defendants investigate the Mission for preferring coreligionists.

About one year later, the Mission was charged with a violation of FEPA and Title VII for declining to hire a self-proclaimed "non-Christian" for one of its Rescued Treasures store associate positions. Hopkins Decl. at ¶¶ 27–29. Pursuant to a workshare agreement with the EEOC, the Department then began what turned out to be a 16-month long investigation. *Id.* at ¶¶ 30, 38.

Left with no choice but to risk enforcement in state court, the Mission hired legal counsel and responded to the complainant's Charge of Discrimination. *Id.* at ¶¶ 31–32. The Mission explained the purpose of its religious employment criteria and noted that the complainant said she "had no faith" during her prescreen interview. *See* VC, Ex. 6-1. Then, in thorough detail, the Mission advised the Department it fell within FEPA's and Title VII's statutory religious exemptions and had a constitutional right to prefer members of the same faith. *Id.*

Still, nine months later, the Department issued a Predetermination Notice ignoring the religious exemptions and concluding that the "evidence supports reasonable cause to believe discrimination occurred" in "violation of state and federal statutes." VC ¶ 119. The Mission responded by reiterating that it was statutorily exempt from claims of religious discrimination under both FEPA and Title VII. *Id.* ¶ 120.

### 3. Defendants cabin FEPA's and Title VII's religious exemptions and find probable cause that the Mission discriminated.

More than a year after the Charge of Discrimination, the Department issued a Final Determination and Proposed Conciliation Agreement. Hopkins Decl. at ¶ 33. The Final Determination was nearly identical to the Predetermination and concluded that "there [was] probable cause to believe discrimination occurred." VC, Ex. 7 at 5. The Department found the Mission to be a "religious organization" and a "501(c)(3) nonprofit Christian rescue mission." *Id.* at 3. Yet, consistent with the Department's prior representations to the Mission, it concluded that the Mission's decision not to hire the complainant "due to [her] non-Christian beliefs" violated FEPA and Title VII. *Id.* at 4–5.

To reach that conclusion, the Department cabined FEPA's and Title VII's religious exemptions by misinterpreting them to apply only to "ministerial employees." *Id.* at 5. The Department cited *Hosanna-Tabor Evangelical Lutheran*

*Church & School v. E.E.O.C.*, 565 U.S. 171 (2012), claiming the "'ministerial' exception should be tailored to th[e] purpose" of protecting the Mission's ability to make employment decisions based on an applicant's "non-Christian beliefs." *Id.* The Department then said the ministerial exception did not apply to the store associate position because it was not "required to serve as a messenger or teacher of [the Mission's] faith or play an instrumental role in [the Mission's] worship services and religious ceremonies or rituals." *Id.*

The Department then proposed a conciliation agreement that would have required the Mission to: (a) pay complainant $3,272.00 in back pay; (b) stop making employment decisions based on religion; (c) review and distribute its Equal Employment Opportunity policy to all employees; (d) give compliance reports to the Department; (e) allow the Department to enter and inspect the Mission's premises, examine witnesses, and examine and copy documents; (f) provide more equal opportunity training to staff and provide copies of those training records; (g) post a notice stating the Mission settled a charge of discrimination with the Department; and (h) provide a report to the Department detailing the Mission's implementation of the conciliation agreement. *Id.* at 6–10.

The Mission declined to conciliate for engaging in constitutionally protected activity, so the EEOC then conducted its own review. Hopkins Decl. at ¶¶ 35–38. The EEOC said it would "mak[e] its own determination" and promised to consider "[a]ll facts and evidence provided by [the Mission] to the [Department]." VC, Ex. 5 at 6. Yet it also concluded the Mission could not prefer hiring coreligionists and "found reasonable cause to believe" discrimination occurred. VC, Ex. 8 at 1. While the EEOC opted not to sue the Mission at that time, it issued the complainant a right-to-sue letter and reserved the right to "sue [the Mission] later." *Id.*

Because Defendants limited both FEPA's and Title VII's religious exemptions to only protect the Mission from liability when it makes employment decisions

about "ministers" (and not for all employees), the Mission has been compelled to alter its employment practices. It has refrained from filling an open store associate position, has removed its employment application and religious hiring criteria from its website, has refrained from disciplining current employees based on religious adherence, and also faces potential liability for recent and future decisions to hire coreligionists. Hopkins Decl. at ¶¶ 41–47. In sum, the Mission needs injunctive relief to protect its constitutional right to prefer coreligionists.

<u>LEGAL STANDARD</u>

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm in the absence of injunctive relief; (3) the movant's alleged harm outweighs any harm to the non-moving party; and (4) the injunction will be in the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Id.* at 1145 (citation and internal quotation marks omitted).

<u>ARGUMENT</u>

**I.      The Mission is likely to succeed on the merits of its claims.**

**A.      Defendants' enforcement of FEPA and Title VII violate the Mission's religious autonomy.**

Religious organizations' fundamental right to autonomy predates the founding. The very reason Puritans fled to America was to establish their own religious autonomy and free themselves from the control of the Church of England. *Hosanna-Tabor*, 565 U.S. at 182–83. This autonomy was so broad that in the colonies, "[c]hurch and state were viewed not so much in terms of union and separation, but as two sovereignties." Kenneth Lasson, Free Exercise in the Free

State: Maryland's Role in Religious Liberty and the First Amendment, 31 J. CHURCH & ST., Fall 1989, at 419, 426. The Religion Clauses were thus designed and adopted, in part, to thwart governmental meddling in "the freedom of religious groups to select their own." *Hosanna-Tabor*, 565 U.S. at 184.

Recognizing this, for over 150 years the Supreme Court has held the First Amendment protects the autonomy of religious organizations. This includes the right to form "voluntary religious associations to assist in the expression and dissemination of any religious doctrine," *Watson v. Jones,* 80 U.S. 679, 728–29 (1871), and safeguards their "independence from secular control or manipulation . . . to decide for themselves, free from state interference, matters of [internal] government as well as those of faith and doctrine," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952).

This doctrine gives religious organizations freedom to make internal membership and employment decisions. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049, 2060 (2020). It does so through two similar, but separate, protections: the coreligionist exemption and the ministerial exception. The former applies to all employees and allows religious groups to employ only individuals who agree with and live out their religious beliefs. *See Seattle's Union Gospel Mission v. Woods,* 142 S. Ct. 1094, 1096 (2022) (Statement of Alito, J.). Put differently, it allows religious organizations to make employment decisions that are rooted in religious belief. The latter applies only to a religious group's "ministerial" employees and prevents the government from interfering with decisions involving those employees, whether or not those decisions were rooted in religious belief. *See Our Lady*, 140 S. Ct. 2049. Defendants' interpretation and application of FEPA and Title VII violate both.

### 1. The Mission has a constitutional right to prefer coreligionists for all positions.

Deciding who to employ necessarily involves the Mission's internal decision making about who is fit to express its religious message and carry out its religious mission. *See Kedroff*, 344 U.S. at 116. The coreligionist exemption applies and prohibits Defendants from enforcing either FEPA or Title VII against the Mission for preferring coreligionists. The right extends to all positions.

#### a. Both Religion Clauses require the coreligionist exemption.

As a subset of the church or religious autonomy doctrine, the coreligionist exemption furthers both Free Exercise and Establishment Clause principles.

First, the coreligionist exemption enables religious groups to freely exercise their religion. Because religious groups exercise their religion by living out their faith, proselytizing, and sharing their religious beliefs, they must be able to ensure their employees agree with, conduct themselves according to, and will advance their religious purpose and message. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335–37 (1987). The Free Exercise Clause therefore "mandate[s]" a certain level of "noninterference" with religious groups' employment decisions. *Id.* at 334.

Second, the coreligionist exemption prevents Establishment Clause violations by keeping government—whether it be the executive or judicial branch—from wading into religious groups' faith-based decisions. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501–04 (1979) (noting that the "very process of inquiry" by the government into religious schools' employment decisions "impinge on rights guaranteed by the Religion Clauses"); *see also Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich,* 426 U.S. 696, 714 (1976).

And it precludes government officials from conditioning a religious group's right to prefer coreligionists on whether a position is sufficiently "religious"—the

exact legal error Defendants made in investigating and attempting to overrule the Mission's religious decision making. As the Supreme Court has explained, "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment." *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977). The coreligionist exemption avoids this problem by letting religious groups freely engage in the "process of self-definition" of their "religious community." *Amos,* 483 U.S. at 342–44 (Brennan, J., concurring).

Other federal courts have acknowledged that religious organizations have a *constitutional* right to prefer coreligionists, usually when explaining the need for Title VII's religious exemption. In *Little v. Wuerl,* 929 F.2d 944, 947, 951 (3d Cir. 1991), the Third Circuit determined that imposing Title VII liability on a Catholic school for its decisions to "employ only persons whose beliefs and conduct are consistent with [its] religious precepts" "would arguably violate both the free exercise clause and the establishment clause of the first amendment." In *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980), to avoid "conflicts [with] the religion clauses," the Fifth Circuit held that Title VII's religious exemption deprived the EEOC of jurisdiction to investigate a religious organization for discrimination when it "present[ed] convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion." And in *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000), the Sixth Circuit explained that Congress enacted Title VII's religious exemption because religious organizations have a "constitutionally-protected interest . . . in making religiously-motivated employment decisions." *See also Spencer v. World Vision, Inc.*, 633 F.3d 723, 742 (9th Cir. 2011) (Kleinfeld, J., concurring) ("But without an exemption for religious institutions, [Title VII] would have the unintended consequence of preventing the free exercise of religion."); *Killinger v. Samford Univ.*, 113 F.3d 196,

201 (11th Cir. 1997) (Title VII's exemption helps courts "avoid the First Amendment concerns which always tower over us when we face a case that is about religion").

Most relevant here, the Tenth Circuit in *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648 (10th Cir. 2002), held the religious autonomy doctrine protects a religious organization's ability to make religiously motivated employment decisions. In *Bryce,* an Episcopal church fired its youth group leader for violating the church's religious teachings about marriage and sexuality. *Id.* at 651–53. Based on various statements made by the church's reverend, the youth group leader sued the church claiming she was sexually harassed in violation of Title VII and in violation of her civil rights. *Id.* at 653.

The Tenth Circuit explained that the Supreme Court "made clear that the constitutional protection [of religious autonomy] extends beyond the selection of clergy to other internal church matters" and "applies with equal force to church disputes over church polity and church administration." *Id.* at 656 (quoting *Milivojevich,* 426 U.S. at 710). The youth group leader's claims were thus barred because the reverend's statements fell "squarely within the areas of church governance and doctrine protected by the First Amendment." *Id.* at 658. So in holding that courts must be hands off in "ecclesiastical" employment disputes "about discipline, faith, internal organization, or ecclesiastical rule, custom or law," the Tenth Circuit effectively recognized the coreligionist exemption. *Id.* at 658 (citation and quotation marks omitted).

### b. Defendants' enforcement of the laws violate the coreligionist exemption.

The Department's and EEOC's enforcement of FEPA and Title VII create the very constitutional concerns discussed above and violate the coreligionist exemption as applied to the Mission.

Everything the Mission does is rooted in its religious beliefs. Its overarching purpose is to "propagate the gospel of Jesus Christ," VC, Ex. 1 at 1, so it spreads this message in everything it does: through its recovery programs, its shelter services, its biblical counseling, and in every other interaction with the people of Casper. The Mission serves its community because the Bible instructs Christians to care for the poor, needy, hungry, and brokenhearted. And its beliefs dictate that the Mission itself—through its employees—disciple one another to become dedicated followers of Christ who strive to live their life according to scripture.

None of this is possible without employees who agree with the Mission's religious beliefs and practices; who seek to advance the same mission, purpose, and vision; and who desire to transform lives through the salvation of Jesus Christ. After all, the Mission is an organization made up of *individuals*. And those individuals are the Mission's heart, hands, and feet. The Mission thus depends on *all* its employees to live out and communicate its faith, and to put that faith into action. Employees who reject or disagree with that faith cannot credibly demonstrate or share it with others. Instead, they would actively undermine it.

As written, FEPA and Title VII protect this right to hire co-believers. Both the Wyoming Legislature and Congress understood FEPA's and Title VII's potential burdens on religious groups, so they passed religious exemptions to counteract them. *See* Wyo. Stat. Ann. § 27-9-102(b); 42 U.S.C. § 2000e-1(a). Those exemptions codified what the Constitution required: religious organizations must be able to hire individuals who share and live out their religious beliefs and practices. *See Amos* 483 U.S. at 334–340 (explaining Title VII's religious exemption reduces both Free Exercise and Establishment Clause concerns); *see also Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) ("The religious-employer exemption[ ] in Title VII . . . [is a] legislative application[ ] of the church-autonomy doctrine.").

15

But those laws' potentially crippling burdens are now reality because Defendants ignore the religious exemptions, reducing them to the ministerial exception. Rather than apply the blanket exemptions enacted by the Wyoming Legislature and Congress, Defendants now parse out the Mission's employees position by position to decide if they are "religious" enough to merit statutory protection. Rather than obey the "noninterference" required by the Religion Clauses, Defendants entangle themselves in religion to the max.

The consequences are severe. Defendants are forcing the Mission "to hire messengers and other personnel who do not share [its] religious views," which "undermine[s] not only [its] autonomy . . . but also [its] continued viability." *Woods*, 142 S. Ct. at 1096 (Statement of Alito, J.). By telling the Mission who it can and cannot hire, Defendants: (a) interfere with the Mission's ability "to define and carry out its religious mission"; (b) require the Mission to "predict which of its activities [Defendants] will consider religious" to invoke the statutory exemptions; and (c) alter "the way [the Mission] carries out its religious mission" due to "potential liability." *Amos*, 483 U.S. at 335–36 (cleaned up). Defendants' commandeering of the Mission's employment decisions through FEPA and Title VII leads to the forced inclusion of employees "who fundamentally disagree" with the Mission and "infringe[s] on [its] rights to freely exercise religion." *Woods*, 142 S. Ct. at 1096.

Even without statutory religious exemptions, "the First Amendment limit[s] [the government's] ability to regulate the employment relationships within churches and similar organizations." *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 n.13 (9th Cir. 1988). That's the case here. Because Defendants seek to enforce FEPA and Title VII against the Mission but refuse to apply the statutes' broad religious

exemptions, the Mission's *constitutional* right to prefer coreligionists steps in. This Court should enjoin the enforcement of FEPA and Title VII against the Mission.[1]

### 2. The Mission's donation center associate, store section lead, and shelter associate positions are also covered by the ministerial exception.

Defendants also violate the First Amendment's ministerial exception by threatening to punish the Mission for, at least, past and future employment decisions related to its donation center associate,[2] store section lead, and shelter associate positions. *See* Hopkins Decl. ¶¶ 41, 44–45 (testifying that the Mission has filled or plans to fill these positions in the coming year).

Under the ministerial exception, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady*, 140 S. Ct. at 2060. Two prerequisites are necessary to invoke the protection: (1) the employer must be a religious organization, and (2) the employee must hold a "ministerial position."

First, the Mission is a religious organization. Its religious beliefs permeate all that it does—from serving the needy to telling others about salvation in Jesus Christ. Indeed, Defendants found the Mission to be "a religious organization located in Casper, Wyoming." VC, Ex. 7 at 3.

Second, the Mission's donation center associate, store section lead, and shelter associate positions are all ministerial positions. There is no "rigid formula"

---

[1] A violation of the First Amendment's coreligionist exemption is per se unconstitutional, so *Employment Division v. Smith*, 494 U.S. 872 (1990), does not control and tiers of scrutiny do not apply. *Bryce*, 289 F.3d at 655–69. But if this Court decides *Smith* controls, the Mission preserves the argument that it should be overruled as inconsistent with the First Amendment's text, history, and tradition.

[2] The prior job position was titled "store associate." The Mission renamed this position as the "donation center associate," but the qualifications, duties, and responsibilities remain the same.

for determining whether a position qualifies as ministerial, rather, "[w]hat matters, at bottom, is what an employee does." *Our Lady*, 140 S. Ct. at 2062, 2064. Ministers include those who "serve[ ] as a messenger or teacher of [the organization's] faith." *Id.* at 2063.

The Mission's donation center associates and store section leads qualify as ministers because they are messengers and teachers of the Mission's Christian faith. Both positions work side-by-side with the Mission's Discipleship Recovery Program guests at Rescued Treasures, where they minister to, pray with, and teach discipleship guests the biblical importance of their jobs and how to model Jesus. VC ¶¶ 63–68; *see also* Decl. of Bernadette Eddy ("Eddy Decl.") at ¶¶ 7–12. Even more, *all* Mission employees—including the donation center associates and store section leads—are messengers of the Mission's faith because they communicate the Gospel and Christian teachings to guests, patrons, and volunteers. VC ¶¶ 148–51; *see also* Hopkins Decl., Ex. B (attaching job descriptions for many positions).

The donation center associate's and store section lead's job duties reflect these spiritual responsibilities. Both positions must "[b]e a consistent witness for Jesus in attitude, speech, and actions demonstrating a daily walk with Jesus Christ"; "[e]ncourage guests, staff, volunteers, and customers to accept God's gift of salvation and grow in their faith"; and "[j]oin in corporate worship and instruction with [fellow] believers." Hopkins Decl., Ex. A at 11, 13. The store section lead must also "[a]ssist management in general spiritual leadership by providing devotionals and prayers as requested." *Id.*, Ex. A at 14. Just as the teacher-ministers in *Hosanna-Tabor* and *Our Lady*, the Mission's donation center associate and store section lead positions are "entrusted with the responsibility of transmitting" their Christian faith. *Our Lady*, 140 S. Ct. at 2064 (cleaned up).

The same is true for the shelter associate position. This person is most people's first point of contact at the Mission, and as such, "must be able to reflect

who [the Mission] is in Christ through their actions, and words." Hopkins Decl., Ex. A at 15. The shelter associate conducts an initial interview with each new guest, attempts to meet their needs, and encourages them, as well as staff and volunteers, to accept God's gift of salvation and to grow in their faith. *Id.*, Ex. A at 15–16.

Defendants' enforcement of FEPA and Title VII against the Mission, at least, violates the ministerial exception as applied to the donation center associate, store section lead, and shelter associate positions.[3]

## B. Defendants' enforcement of FEPA and Title VII violate the Mission's other First Amendment rights.

### 1. Defendants' enforcement of the laws are neither neutral nor generally applicable and thus violate the Free Exercise Clause.

Defendants' enforcement of FEPA and Title VII violate the Free Exercise Clause for another reason: it burdens the Mission's religious exercise, is not neutral or generally applicable, and cannot satisfy strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "Neutrality and general applicability are interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.*

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). A lack of neutrality can be "masked, as well as overt," so courts must scrutinize the law or regulation for even "subtle departures from neutrality." *Lukumi*, 508 U.S. at 534.

---

[3] Given Defendants' interpretation of the challenged laws, a finding that these three positions are covered by the ministerial exception—though warranted—will not eliminate all constitutional violations. The Mission recently filled and plans to fill other positions with coreligionists because those positions share the same religious requirements. VC ¶¶ 146–52; Hopkins Decl. at ¶¶ 44–45. A ruling upholding the Mission's First Amendment right to prefer coreligionists for *all* positions is thus needed.

Defendants' enforcement of FEPA and Title VII are not neutral. Less than three years ago, the Department singled out the Mission when it specifically contacted the ministry, telling it to stop its religious hiring practices. The Mission was kicked off the Department's job postings platform as a result. VC ¶¶ 100–07. Such "hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018).

Applying FEPA and Title VII against the Mission despite explicit statutory religious exemptions also highlights the lack of neutrality. *See Lukumi*, 508 U.S. at 534 ("Facial neutrality is not determinative."). The Mission pointed out to Defendants from the start that it was exempt under FEPA's and Title VII's religious exemptions, yet they ignored them. This, too, creates at least a "slight suspicion" of hostility sufficient to trigger strict scrutiny. *Id.* at 547.

Moreover, a law is not generally applicable when the government allows individualized exemptions through "subjective" "ad hoc discretionary decisions." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297–99 (10th Cir. 2004) (cleaned up); *Fulton,* 141 S. Ct. at 1877. That's precisely what Defendants did to the Mission. Government officials within the Department and EEOC now evaluate case-by-case whether the Mission's employees are religious enough to qualify as exempt under FEPA and Title VII. This unchecked discretion renders the laws not generally applicable. *See Axson-Flynn*, 356 F.3d at 1298 (a law is not generally applicable if exemptions are determined "on a case-by-case basis").

## 2. Defendants' enforcement of the laws also violate the Mission's right to expressive association.

Defendants' forced inclusion of nonbelievers also infringes the Mission's First Amendment right "to associate with others in pursuit of . . . religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). This right to expressive association

includes "freedom not to associate" with people who "may impair [the group's] ability" to express its views. *Id.* at 647–48. The right comes into play if (1) "the group engages in 'expressive association,'" and (2) "the forced inclusion" of a person "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* The Mission satisfies both elements.

First, the Mission clears the first hurdle because it "engage[s] in some form of expression." *Id.* at 648. As reflected in its foundational documents, the Mission's principal purpose is to "*propagate* the gospel of Jesus Christ." VC, Ex. 1 at 1, ECF No. 1-1 (emphasis added). For example, its employees *share* the Gospel and pray with discipleship guests, patrons, volunteers, and all other people. The Mission also expresses its views during and through its hiring process. It tells applicants— through its documents, on its website, and in person—that it is a Christian ministry that seeks to transform lives not only through its services but also by spreading its Christian faith. In short, the Mission's "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring).

Second, by threatening to penalize the Mission for its hiring practices, Defendants force it to hire people who "would significantly affect" its ability to convey its religious message. *Dale*, 530 U.S. at 650. This is also an easy hurdle because courts must "give deference to an association's view of what would impair its expression." *Id.* at 653. Having nonbelievers as the Mission's representatives would undermine the Mission's Christian purpose and dilute its ability to share its Christian beliefs. *See id.* at 653–54 (explaining that the *presence* of an unwanted person would "force the organization to send a message, both to [fellow-members] and the world" that the person's point of view is "legitimate"); *see also* Eddy Decl. ¶ 13 (explaining that employees would leave Rescued Treasures if the Mission could no longer hire coreligionists).

Consider the donation center associate and store section lead positions for example. If the Mission were forced to hire a nonbeliever for either of those positions, he or she could not inculcate Christian principles in discipleship to guests and coworkers while working alongside them at Rescued Treasures. In fact, that person could be an avowed atheist who teaches discipleship guests that faith in God is foolishness. What could be more harmful to a *Christian* ministry than requiring it, on pain of substantial liability, to hire self-professed *non-Christians* who do not share the same worldview, beliefs, and faith? Using FEPA and Title VII as the stick, nonbelievers could effectively infiltrate the Mission, undercutting its religious message until the Mission as we know it "cease[s] to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006).

### 3.  FEPA and Title VII fail strict scrutiny as applied to the Mission.

Because Defendants' enforcement of the laws infringe the Mission's First Amendment rights, they must survive strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). This means that Defendants must prove enforcement of FEPA and Title VII *specifically against the Mission* serves a compelling interest and is narrowly tailored to achieve that interest. *Fulton*, 141 S. Ct. at 1881; *Dale*, 530 U.S. at 648. They cannot.

A compelling interest cannot be "broadly formulated" or based on speculation. *Id.* at 1881–82 (citation omitted). Defendants cannot assert "a compelling interest in enforcing [their] non-discrimination policies generally"; they must instead give a compelling reason to deny an exception to the Mission. *Id.* But there is no compelling interest in forcing a religious ministry to employ people who have conflicting religious beliefs. *See id.* (no compelling interest in denying Catholic foster agency an exemption from non-discrimination policy). Any alleged interest in preventing discrimination through FEPA and Title VII does not "justify such a

severe intrusion" on the Mission's "freedom of expressive association" and religious exercise. *Dale*, 530 U.S. at 659.

Defendants also cannot establish a compelling interest because FEPA and Title VII already recognize that religious exemptions are required. And Defendants now make individualized decisions about whether the exemptions apply in any given scenario. This "system of exceptions . . . undermines [any] contention that [FEPA and Title VII] can brook no departures." *Fulton*, 141 S. Ct. at 1882. The Mission's free exercise and expression rights trump any competing interest.

In addition, FEPA and Title VII, as currently enforced by Defendants, are not narrowly tailored. If the government "can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. Here, the Wyoming Legislature and Congress narrowly tailored FEPA and Title VII by enacting broad religious exemptions—exemptions that furthered governmental interests in nondiscrimination without burdening religious exercise. But Defendants have lawlessly disregarded those exemptions. So their enforcement of the laws cannot be narrowly tailored to achieve any purported interest in nondiscrimination or otherwise.

## C. The EEOC's interpretation and application of Title VII violates RFRA.

The Religious Freedom Restoration Act ("RFRA") prohibits the EEOC from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government proves that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. So RFRA subjects the EEOC's enforcement of Title VII against the Mission to strict scrutiny from the get-go. *Id.* § 2000bb-3(a). For the same reasons

stated above, *supra* § I.B.3, forcing the Mission to employ self-proclaimed nonbelievers flunks the test.[4]

## II.  The other preliminary injunction factors weigh heavily in favor of granting injunctive relief.

The Mission also satisfies the irreparable harm, balance of equities, and public interest factors warranting a preliminary injunction.

When a plaintiff shows a likelihood of success on the merits of a constitutional claim, "no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation and quotation marks omitted). This is so because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145 (10th Cir. 2013) (en banc) (citation omitted).

The Mission suffers ongoing and a threat of irreparable harm in at least three ways. First, the Mission is harmed by having to alter its faith-based hiring practices to avoid potential liability. The Mission has refrained from filling an open donation center associate position, and has removed its employment application and religious hiring criteria from its website. Hopkins Decl. at ¶¶ 41–42. Second, the Mission currently operates under a looming cloud of enforcement and liability for recent decisions to screen out applicants who did not profess agreement with its religious beliefs and practices, and it plans to fill over 30 more positions in the coming year. *Id.* at ¶¶ 44–45. A charge of discrimination could be filed at any time, triggering another prolonged and costly investigation, which itself is injury. *See SBA List v. Driehaus*, 573 U.S. 149, 165 (2014). Last, the Mission has been chilled

---

[4] The EEOC's interpretation and application of Title VII also violates the constitutional avoidance canon. If "the validity of an act of the Congress is drawn in question," or "a serious doubt of constitutionality is raised, it is a cardinal principle" to first give the statute a fair reading that avoids the constitutional issues. *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749 (1961).

from making faith-based employment decisions for *current* employees because of the risk and fear of liability under Defendants' enforcement of the laws. By forcing the Mission to decide between its religious exercise and expression on the one hand, or avoiding potential liability on the other, Defendants deny the Mission its constitutional rights—an injury that cannot be compensated monetarily.

The balance of equities also heavily tips in the Mission's favor. "[W]hen [government action] is likely unconstitutional, the interests of those the government represents, . . . do not outweigh a plaintiff's interest in having its constitutional rights protected." *Hobby Lobby*, 723 F.3d at 1145 (cleaned up). Unless injunctive relief is granted, the Mission will "remain subject to the Hobson's choice between [lengthy investigations, penalties, and other enforcement] or violating its religious beliefs." *Id.* at 1146–47. Meanwhile, enjoining Defendants would only prevent them from unconstitutionally enforcing FEPA and Title VII against the Mission.

Lastly, a preliminary injunction would be in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1147 (citation and quotation marks omitted). Enjoining Defendants here would still allow them to apply FEPA and Title VII against other employers that do not have religious justifications for their employment decisions. Protecting the Mission's First Amendment rights therefore benefits the public interest.

## CONCLUSION

Because the Mission is likely to succeed on the merits of its claims and satisfies the remaining preliminary injunction factors, the Mission is entitled to a preliminary injunction protecting the Mission's rights to prefer hiring coreligionists, to exercise its religious beliefs, and to spread its religious message.

Respectfully submitted this 11th day of October, 2022.

<div style="display:flex">
<div>

David A. Cortman*
AZ Bar No. 029490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 030469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

</div>
<div>

s/ *Jacob E. Reed*
Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

John G. Knepper
WY Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

</div>
</div>

*Counsel for Plaintiff*

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, I electronically filed the foregoing

using the CM/ECF system, and I hereby certify that the same will be served via

certified mail and by process server to non-ECF participants:

**Equal Employment Opportunity Commission**
131 M. Street, NE
Washington, D.C 20507

**Charlotte A. Burrows**
Chair of the United States Equal Employment Opportunity Commission
131 M. Street, NE
Washington, D.C 20507

**Merrick B. Garland**
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue,
NW Washington, DC 20530-0001

**Nick Vassallo**
Acting United States Attorney for the District of Wyoming
United States Attorney's Office
J.C. O'Mahoney Federal Courthouse
2120 Capitol Avenue, Suite 4000
Cheyenne, WY 82001

<div align="right">

*/s/ Jacob E. Reed*
Jacob E. Reed

*Counsel for Plaintiff*

</div>